## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| MIGUEL FLEITAS, individually and on behalf of all others similarly situated, and<br><br>Plaintiff,<br>v.<br><br>VITAS HOSPICE SERVICES, L.L.C.,<br><br>Defendant. | Case No.  1:25-cv-25549<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Miguel Fleitas ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to his and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Vitas Hospice Services, L.L.C. ("Vitas Hospice" or "Defendant"), and alleges as follows:

### INTRODUCTION

1.      Plaintiff brings this action on behalf of himself, and all other individuals similarly situated ("Class Members") against Vitas Hospice for its failure to secure and safeguard the personally identifiable information ("PII") and private health information ("PHI") of Plaintiff and Class Members.

2.      Vitas Hospice is a healthcare provider with its principal place of business in Florida that provides hospice care services to its patients across the country. In the regular course of its business, Vitas Hospice is required to maintain reasonable and adequate security measures to protect its patients' PII/PHI from unauthorized access and disclosure.

3.      Between approximately September 21 and October 27, 2025, an unauthorized third party compromised the account of a third-party vendor and used that account to access certain Vitas Hospice systems that contained sensitive personal and health information relating to Vitas Hospice patients and, in some cases, their family members or other contacts (the "Data Breach").

4.      Vitas Hospice owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Vitas Hospice breached its duty by, among other things, failing to, or contracting with companies that failed to, implement and maintain reasonable security procedures and practices to protect patients' PII/PHI from unauthorized access and disclosure. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their patients' and employees' data.

5.      Vitas Hospice required its patients, and in many cases their family members and next of kin, to provide sensitive PII/PHI and related contact information and failed to protect it. Vitas Hospice had an obligation to secure this information by implementing reasonable and appropriate data security safeguards. This obligation was part of the bargain between Vitas Hospice and its patients and their family members, including Plaintiff and Class Members.

6.      As a result of Vitas Hospice's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII/PHI have been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII/PHI stolen here and

the fact that the compromised PII/PHI is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII/PHI, which PII/PHI is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7.      Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8.      Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Vitas Hospice to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

9.      Plaintiff Miguel Fleitas is a natural person and resident of Hialeah, Florida, where he intends to remain. In November 2025, Vitas Hospice notified Plaintiff that his and his deceased wife's personal information was compromised in the Data Breach.

10.     Defendant Vitas Hospice is a Delaware limited liability company that provides hospice and healthcare services, with its principal place of business located at 201 S Biscayne Blvd, Suite 400, Miami, FL 33131.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

interest and costs. Plaintiff and Defendant are citizens of different states, and there are over 100 putative Class Members.

12.     This Court has personal jurisdiction over Defendant because its principal place of business is in Florida, it regularly conducts business in Florida, and maintains sufficient minimum contacts in the state.

13.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

14.     This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress Vitas Hospice's willful and reckless violations of his privacy rights. Plaintiff and the other Class Members are patients, former patients, and their family members whose information Vitas Hospice collected and maintained in connection with providing hospice services.

15.     This action pertains to Vitas Hospice's unauthorized disclosure of Plaintiff's and Class Members' personal information, including Plaintiff's next-of-kin contact information and his deceased wife's PII/PHI, that occurred during the Data Breach.

16.     Between approximately September 21 and October 27, 2025, an unauthorized third party used a compromised vendor account to access certain Vitas Hospice systems and obtain Plaintiff's and the Class Members' PII/PHI.

17.     Vitas Hospice disclosed Plaintiff's and the other Class Members' PII/PHI to unauthorized persons as a direct and/or proximate result of Vitas Hospice's failure to safeguard and protect their PII/PHI.

18.     By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, Vitas Hospice assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII/PHI from unauthorized disclosures.

19.     Despite recognizing its duty to do so, Vitas Hospice failed to implement security safeguards to protect Plaintiff's and the Class Members' PII/PHI.

20.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII/PHI and relied on Vitas Hospice to keep their PII/PHI confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### A.     The Data Breach

21.     According to a data breach notification ("Breach Notice") posted on Vitas Hospice's website, unauthorized access to its network systems occurred between September 21 and October 27, 2025. During this period, an unauthorized third party accessed files from Vitas Hospice's computer network that contained PII and PHI, including full names with dates of birth, Social Security Numbers (SSN), driver's licenses, insurance information, and patients' PHI. The information also included next-of-kin contacts like names, phone numbers, and email addresses.

22.     Vitas Hospice only discovered the Data Breach on October 24, 2025. The Breach Notice posted on Vitas Hospice's website did not specify detailed measures or actions taken by Vitas Hospice to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

### B.     The Data Breach was Preventable

23.     Had Vitas Hospice maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Vitas Hospice could have safeguarded patient

and patient data. Vitas Hospice's lack of security controls and implementation of enhanced security measures only after the Data Breach are inexcusable.

24.     Vitas Hospice was at all times fully aware of its obligation to protect patients' PII/PHI and the risks associated with failing to do so. Vitas Hospice knew that information of the type collected, maintained, and stored by Vitas Hospice is highly coveted and a frequent target of hackers.

25.     This exposure, along with the fact that the compromised PII/PHI is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



26.     By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[1]

---

[1] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), *available at* https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

27.     Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

28.     When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

29.     In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

30.     In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

31.     In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some

---

[2] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020), *available at:* https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last accessed June 20, 2025).

[3] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023), *available at* https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx (last visited June 20, 2025).

[4] *Id.*

found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patient personal information."[5]

32.    In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

33.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

34.    Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, patients, and

---

[5] *Id.*
[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited June 20, 2025).
[7]    Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sit es/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf, (last visited June 20, 2025).

the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

35.     The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11]

36.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you

---

[8]  *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (Last visited June 20, 2025).
[9] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available* at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 20, 2025).
[10]  Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2 (last visited July 28, 2021).
[11]  *In the Dark*, VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 20, 2025).

never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

37.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

38.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

39.     Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

40.     The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[14]

---

[12] *Identity Theft and Your Social Security Number* (Oct. 2024), SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 20, 2025).
[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 20, 2025).
[14] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthe

41.     Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

42.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

43.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

44.     Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

45.     For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[16]

---

m-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html   (last   visited June 20, 2025).

[15] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited June 20, 2025).
[16] *Id.*

46.     The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

**C.     Vitas Hospice Failed to Comply with the Federal Trade Commission**

47.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

48.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals for business.[18] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the

---

[17] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-   language/pdf0205-startwithsecurity.pdf   (last visited June 20, 2025).

[18] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016),   https://www.cliclaw.com/library/us-federal-laws/data-security/ftc-released-guide-protecting-personal-information-guide#:~:text=Protecting%20Personal%20Information%3A%20A%20Guide%20for%20Business%20October,card%20details%20to%20prevent%20fraud%20and%20identity%20theft (last visited June 20, 2025).

system; watch for large amounts of data being transmitted form the system; and have a response plan ready in the event of a breach.[19]

49.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

50.     Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

**D.     The Impact of Data Breach on Victims**

51.     Vitas Hospice's failure to keep Plaintiff's and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

---

[19] *Id.*
[20] FEDERAL TRADE COMMISSION, *Start With Security*, *supra* note 17.

52.     The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

53.     Further, malicious actors often wait months or years before using the PII obtained in data breaches, as victims become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

54.     Given the confirmed exfiltration of patient PII/PHI from Vitas Hospice, many victims of the Data Breach have likely already experienced significant harms, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and searching for unauthorized activity.

55.     It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[21]

56.      Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[22]

57.      Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts…individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the

---

[21] *2021 Consumer Aftermath Report:  How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (May 2021), *available at* https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_ Report.pdf (last visited June 8, 2025).
[22] *Id.*

emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

58. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, a harm recognized by courts as an independent form of harm.[23]

59. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated or accessed by different criminal actors who intend to use it for various fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

60. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

   a.   The unconsented disclosure of confidential information to a third party;

   b.   Unauthorized use of their PII/PHI without compensation;

   c.   Losing the value of the explicit and implicit promises of data security;

   d.   Losing the value of access to their PII/PHI permitted by Vitas Hospice without their permission;

   e.   Identity theft and fraud resulting from the theft of their PII/PHI;

---

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

f.   Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g.   Anxiety, emotional distress, and loss of privacy;

h.   The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.   Unauthorized charges and loss of use of and access to their accounts;

j.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

k.   Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.   The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII/PHI being in the possession of one or more unauthorized third parties.

61.   Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically involves significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims reported spending an average of 7 hours resolving issues related to identity theft or fraud.[24]

62.   Plaintiff and Class Members place significant value in data security. According to a survey conducted by cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a

---

[24] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited June 20, 2025).

provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[25]

63.     Plaintiff and Class Members have a direct interest in Vitas Hospice's promises and duties to protect PII/PHI, i.e., that Vitas Hospice would *not increase* their risk of identity theft and fraud. Because Vitas Hospice failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Vitas Hospice's wrongful conduct. Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have occupied but for Vitas Hospice's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII/PHI.

64.     Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through Vitas Hospice's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous— the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate

---

[25]     Richard Turner, *Beyond the Bottom Line:  The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited June 20, 2025).

here under common law principles of damages, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

65.     Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as Vitas Hospice continues to retain their PII.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action on behalf of himself and all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure

**Nationwide Class**
All persons residing in the United States whose personally identifiable information or personal health information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

67.     Excluded from the proposed Class are any officer or director of Vitas Hospice; any officer or director of any affiliate, parent, or subsidiary of Vitas Hospice; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

68.     Numerosity, Fed R. Civ. P. 23(a)(1). Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Vitas Hospice's own records.

69.     Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a.     Whether Vitas Hospice engaged in the wrongful conduct alleged here;

b.     Whether Vitas Hospice's inadequate data security measures were a cause of the Data Breach;

c.     Whether Vitas Hospice owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII and/or PHI;

d.     Whether Vitas Hospice negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII and/or PHI;

e.     Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f.     Whether Vitas Hospice failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII and/or PHI;

g.     Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

70.     Vitas Hospice engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

71.     Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII and/or PHI accessed by and/or disclosed to unauthorized third parties. Vitas Hospice's misconduct affected all Class Members in the same manner.

72.     Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action

litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

73.     <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Vitas Hospice, making it impracticable for Class Members to individually seek redress for Vitas Hospice's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation could lead to inconsistent or contradictory judgments and increase delays and expenses for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

74.     Plaintiff realleges paragraphs 1 through 73 as if fully set forth herein.

75.     Plaintiff brings this claim individually and on behalf of the Class.

76.     Vitas Hospice owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII/PHI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that

Plaintiff's and Class Members' PII/PHI in Vitas Hospice's possession was adequately secured and protected.

77.     Vitas Hospice owed, and continues to owe, a duty to Plaintiff and the other Class Members to safeguard and protect their PII/PHI.

78.     Vitas Hospice breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII/PHI.

79.     It was reasonably foreseeable that Vitas Hospice's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII/PHI would result in an unauthorized third-party gaining access to such information for no lawful purpose.

80.     As a direct result of Vitas Hospice's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's deceased wife's confidential medical information, together with Plaintiff's and Class Members' personal and medical information, Plaintiff and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

81.     By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access Vitas Hospice's systems containing the PII/PHI at issue, Vitas Hospice failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Vitas Hospice has failed to do as discussed herein.

82.     Vitas Hospice's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

83.     Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

84.     Vitas Hospice's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

85.     As a result of Vitas Hospice's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Vitas Hospice's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

86.     Plaintiff realleges paragraphs 1 through 73 as if fully set forth here.

87.     Plaintiff and Class Members, or their patients or family members, contracted or otherwise entered into relationships with Defendant for hospice and related health care services, in the course of which Defendant collected and maintained their PII/PHI.

88.     Plaintiff and Class Members were required to provide their PII/PHI to Defendant as a condition of receiving, or having a family member receive, hospice and related services from Defendant.

89.     Plaintiff and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

90.     Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

91.     Plaintiff and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant in exchange for hospice and related services.

92.     In turn, and through internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

93.     In its Privacy Policy, Defendant represented that it had a legal duty to protect Plaintiff's and Class Members' Private Information.

94.     Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

95.     After all, Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

96.     Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

97.     The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with the execution of contracts and the discharge of performance and other duties according to their terms, mean preserving the spirit—and not merely the letter—of the

bargain. In short, the parties to a contract are mutually obligated to comply with its substance as well as its form.

98.     Subterfuge and evasion violate the duty of good faith in performance, even when an actor believes their conduct is justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

99.     Defendant materially breached the contracts it entered into with Plaintiff and Class Members by:

      a.     failing to safeguard their information;

      b.     failing to notify them promptly of the intrusion into its computer systems that compromised such information.

      c.     failing to comply with industry standards;

      d.     failing to comply with the legal obligations necessarily incorporated into the agreements; and

      e.     failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

100.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

101.    Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed supra).

102.    And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

103.    Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**COUNT III**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

104.    Plaintiff realleges paragraphs 1 through 73 as if fully set forth here.

105.     Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

106.     Defendant owed a duty to its current and former patients and their next-of-kin, including Plaintiff and the Class, to keep this information confidential.

107.     The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' Private Information is highly offensive to a reasonable person.

108.     The intrusion was into a place or thing that was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

109.     The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

110.     Defendant acted with a knowing state of mind when it permitted the Data Breach, knowing its information security practices were inadequate.

111.     Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

112.     Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

113.     As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information of Plaintiff and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

114.     And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

115.     Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff, and the Class, since their Private Information is still maintained by Defendant with their inadequate cybersecurity system and policies.

116.     Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiff and the Class.

117.     In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### COUNT IV
### <u>UNJUST ENRICHMENT</u>
### (On Behalf of Plaintiff and the Class)

118.     Plaintiff realleges paragraphs 1 through 73 as if fully set forth herein.

119.     Plaintiff and Class Members conferred a monetary benefit upon Vitas Hospice in the form of monies paid to Vitas Hospice for healthcare or related services, with an implicit

understanding that Vitas Hospice would use some of these payments to protect the PII/PHI they collect, store, and use to provide health care.

120.    Vitas Hospice accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Vitas Hospice also benefited from the receipt of Plaintiff's and Class Members' PII/PHI, as this was used to facilitate billing and payment services and other aspects of Vitas Hospice's business.

121.    As a result of Vitas Hospice's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between its payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

122.    Vitas Hospice should not be permitted to retain the money belonging to Plaintiff and the Class Members because Vitas Hospice failed to adequately implement the data privacy and security procedures that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

123.    Vitas Hospice should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Vitas Hospice, as follows:

(a)    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Counsel for the Class;

(b)    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

(c)    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Vitas Hospice from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

(d)    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

(e)    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

(f)    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: November 25, 2025

Respectfully submitted,

*/s/ Robert R. Jimenez*
Robert R. Jimenez (Fla. Bar No. 72020)
Markus M. Kamberger (Fla. Bar No. 111566)
Natalie M. Rico (Fla Bar No. 65046)
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
P: (786) 206-7896
rjimenez@brysonpllc.com;
mkamberger@brysonpllc.com;
nrico@brysonpllc.com

*Counsel for Plaintiff*